United States District Court
Southern District of Texas
**ENTERED**
August 06, 2026
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| John Crabtree, | § | |
| *Plaintiff*, | § | |
| v. | § | Civil Action No. 4:25-cv-00737 |
| Certarus (USA) Ltd., | § | |
| *Defendant*. | § | |

**MEMORANDUM, RECOMMENDATION, AND ORDER**

This is an employment and employment benefits dispute. Plaintiff John Crabtree filed a motion for sanctions against Defendant Certarus (USA) Ltd. Dkt. 80. Certarus then moved for summary judgment on all claims. Dkt. 86. After reviewing the motions, the responses, Dkts. 87, 93, the replies, Dkts. 89, 98, the record, and the applicable law, it is recommended that the motion for summary judgment be granted in part and denied in part. It is ordered that Crabtree's motion for sanctions be denied.

## Background

### I. Crabtree's employment at Certarus

Crabtree worked for Certarus as a regional technician from November 15, 2021 to May 24, 2024. Dkt. 86-2 at 37-39 (offer letter); Dkt. 86-11 at 5-6 (termination letter). Certarus is a company that delivers clean-burning fuels to remote communities and industrial customers. Dkt. 86-2 at 5.

Part of Crabtree's job required him to drive a Certarus company truck to and from customer sites. *See id.* at 38, 41 (general manager declaration); Dkt. 86-3 at 2 (operations manager's declaration). Certarus's vehicles include a monitoring system called Samsara. Dkt. 86-2 at 18; *see also* Dkt. 86-4 at 9 (vehicle use policy). That system records "driver events," like collisions and "fatigue driving events" where the driver fell asleep at the wheel. *See* Dkt. 86-2 at 18-19; Dkt. 86-7 at 5 (documenting Crabtree's driving events). Crabtree was subject to performance reviews and coaching depending on recorded driving events. *See* Dkt. 86-2 at 18-19; *see also* Dkt. 86-4 at 11.

On June 2, 2022, Crabtree backed into a generator, causing minor damage to the company vehicle's bumper. *See* Dkt. 86-5 at 21-24 (incident report); *see also* Dkt. 86-2 at 19 (deposition). Crabtree also experienced a fatigued driving incident on July 15, 2022, where the Samsara system recorded him driving over a cattle guard. *See* Dkt. 86-5 at 4 (placeholder for video), 12-

13 (email regarding post-event coaching). Crabtree maintains that he had not fallen asleep at the wheel. *See* Dkt. 86-2 at 20.

About three months later, Samsara recorded a second fatigue incident involving Crabtree. *See* Dkt. 86-5 at 6 (Samsara video); *see also* Dkt. 86-6 at 3-8 (incident report). Crabtree struck a barrel light, damaging the truck's mirror. Dkt. 86-2 at 20-21.

The next year, in March 2023, Crabtree drove the truck into a ditch. *See id.* The event triggered a "harsh braking" warning on the Samsara system. *Id.*

On May 6, 2023, Crabtree applied for a technician coordinator position. Dkt. 86-6 at 12-13 (email application). He was interviewed by Crystal Martinez, an operations manager. Dkt. 86-3 at 2 (Martinez's declaration). According to Crabtree, he has degenerative disc disease and other medical conditions that cause back pain. *See* Dkt. 86-2 at 9 (Crabtree's deposition); *see also* Dkt. 86-8 at 2. But when applying and interviewing for the position, Crabtree did not mention his back condition, any physical limitations, or a need for accommodation. *See* Dkt. 86-3 at 2; Dkt. 86-2 at 13. Martinez was not aware that Crabtree had back issues. Dkt. 86-3 at 2. In fact, Crabtree had never admitted to anyone that he had back issues. Dkt. 86-2 at 9.

Later that month, Crabtree told his immediate supervisor, Bryan Holcomb, about his back condition. *Id.* Holcomb did not share the information with Martinez, to whom Holcomb reported. *Id.*; Dkt. 86-3 at 2. Crabtree asked

Holcomb for time off to obtain medical care. Dkt. 86-6 at 18-19. His request was granted. Dkt. 86-2 at 12.

Soon after, Martinez informed Crabtree that he was not chosen for the technician coordinator position. Dkt. 86-6 at 21-22. It is undisputed that the person whom Certarus selected was qualified for the job. *See* Dkt. 86-2 at 13.

On August 13, 2023, Samsara recorded Crabtree's third fatigued driving event. Dkt. 86-5 at 8 (video). Crabtree had fallen asleep while driving and hit a road sign. *See id.*; *see also* Dkt. 86-7 at 5. Two days later, Holcomb reported Crabtree's fatigued driving events to his own supervisor, Martinez; the general manager, Chris Lucas, to whom Martinez reported; and human resources personnel. Dkt. 86-7 at 3. Holcomb identified two options: "switch[] [Crabtree] to day shift and risk another possible incident, or termination." *Id.*

On August 17, 2023, Crabtree received a "final warning" due to his driving incidents. *See id.* at 5-6 (progressive action form); *see also* Dkt. 86-2 at 42 (Lucas's declaration); *id.* at 22-23 (deposition). Crabtree was moved to the day shift and required to complete additional training and ride-alongs with a driving trainer. *See* Dkt. 86-7 at 5-6; *see also* Dkt. 86-2 at 23. That was Crabtree's first written disciplinary action at Certarus. Dkt. 97-7 at 21 (request for admission).

On February 9, 2024, Crabtree requested time off work to receive medical care. Dkt. 86-6 at 24 (email with Holcomb). That request was approved. *Id.*; *see also* Dkt. 86-2 at 27.

About a week later, Crabtree applied for a position at Certarus as a technical training specialist. Dkt. 86-7 at 12-13 (application). His application did not mention his back issues or any need for accommodation. *See id.*; *see also* Dkt. 86-2 at 15. The next month, Crabtree was interviewed for the position by Mark Chagnon, a senior technical training specialist. Dkt. 86-2 at 10 (March 7, 2024 interview). During the interview, Chagnon noted that the specialist position had a lower salary but provided for more personal time, which Chagnon himself found helpful because of his own age. Audio at 33:13-33:30, 34:48-35:03 (Chagnon describing himself as 60 years old).[1] Crabtree responded, "[y]eah I feel you," mentioned turning "42 this year," and explained that he "found out" in his early 20's that he had "degenerative disc disease …." *Id.* at 35:04-35:17. Crabtree said that a disc in his spine had "completely disappear[ed]," *id.* at 35:22-35:28, and disc disease is why he stopped offshore diving, *see id.* at 35:29-35:38. The conversation then pivoted to other, unrelated topics. *See, e.g.*, *id.* at 35:45 ("what's your favorite dive hat?").

[1] The parties also provided transcripts of that recorded interview. *See* Dkt. 86-7 at 29-46; Dkt. 96-4 at 5-21. Those transcripts are materially similar but have minor inaccuracies compared to the recording.

That same day, Crabtree disclosed his back condition to human resources. Dkt. 86-2 at 9-10. He and his physician completed a fitness-for-duty form to support a light duty request, which was granted. Dkt. 86-8 at 1-7; *see also* Dkt. 86-2 at 11.

A few days later, Crabtree received word that he was not selected for the technical training specialist position. Dkt. 86-8 at 9 (email). Nicholas Fontaine, who made the hiring decision, believed that Crabtree lacked the necessary knowledge and skills. *See* Dkt. 86-7 at 16. Fontaine was not told about Crabtree's back condition. *See id.*

Crabtree received a safety leadership award on March 22, 2024. Dkt. 96-4 at 1-2. But Crabtree had another Samsara driving event less than a month later, when he hit a pothole. Dkt. 86-2 at 24; Dkt. 86-5 at 10 (video).

A month later, Crabtree emailed Martinez, Holcomb, and human resources personnel Caitlin Miles and Samie Flores that he needed time off due to a slipped vertebrae that required surgery. *See* Dkt. 86-9 at 11 (April 22, 2024 email). Flores responded with information about short-term disability leave, which Crabtree applied for and received. *See* Dkt. 86-10 at 1, 6-8; Dkt. 86-2 at 12 (testifying that he exhausted his short-term disability benefits).

Around the same time, Crabtree's supervisors discussed his latest driving incident and termination. *See, e.g.*, Dkt. 86-8 at 11-13 (April 16, 2024 emails); Dkt. 86-2 at 42 (Lucas's declaration). On April 24, 2026, Martinez

emailed HR that, while Crabtree is an "excellent Regional tech," his driving "has damaged Certarus equipment numerous times and" Crabtree "has shown negligence on the maintenance of his vehicle." Dkt. 86-10 at 10. Martinez also expressed concern that "keeping [Crabtree] as a tech can ultimately lead into something fatal." *Id.* Lucas agreed with Martinez's assessment and termination decision. Dkt. 86-2 at 43. At the time, he did not know that Crabtree was on medical leave. *Id.* Lucas formally "approved the termination" on May 20, 2024. *Id.*

Martinez requested a summary of Crabtree's driving events, which she sent to human resources. Dkt. 97 at 27-28 (May 2024 emails). Flores calculated Crabtree's severance amount. *Id.* at 26. In that same correspondence, Flores provided other human resources personnel an "update [] on the reason for the request to terminate" Crabtree, listing his multiple driving incidents and related damages. *Id.* at 26-27. The email noted that Crabtree was on disability leave. *See id.* Crabtree was terminated on May 24, 2024. Dkt. 86-11 at 5-6 (termination letter).

## II. <u>Crabtree's benefits following termination</u>

During a May 24, 2024 phone call, Crabtree discussed with Certarus personnel the impact of his termination on certain benefits . *See* Dkt. 97-1 at 5-6 (call with Flores and Martinez). Despite claiming that he was misinformed about life insurance benefits during that call, Dkt. 93 at 18, the transcript of

the call reflects the discussion addressed disability benefits only. *See* Dkt. 97-1 at 5-6.[2] In particular, the Certarus representative explained, "Yeah it [i.e., the disability leave] was a company benefit, so I don't think we could do that and transfer it over. But I will definitely, as soon as I get to you, I will get all to look into all that." *Id.* at 6. Crabtree also confirmed, at his subsequent deposition, that the discussion had centered around disability benefits. *See* Dkt. 86-2 at 31.

Crabtree ultimately exhausted his short-term disability benefits. *See id.* at 12, 31. Since his termination, he has continued to receive long-term disability benefits. *See id.* at 31; Dkt. 86-11 at 9-11 (April 21, 2026 letter confirming that Crabtree remains eligible for long-term disability benefits).

As another benefit of his employment, Crabtree had a life insurance policy administered by BlueCross BlueShield of Texas. *See* Dkt. 86-4 at 6 (Flores's declaration). Crabtree's policy was worth around $300,000. Dkt. 86-2 at 34. The Employee Benefit Booklet, which functioned as a summary plan description ("SPD"), instructed employees that they "may convert to an individual policy" if they are "no longer employed by" the policy-holding employer. *See* Dkt. 86-11 at 18-22 (booklet). Employees must apply for conversion "within 31 days after life insurance under the Policy ceased." *Id.* at

[2] The audio recording was not provided to the Court. But the parties do not dispute the transcript's accuracy.

21. If the employer "fails to notify the [employee] at least 15 days prior to the date insurance under the Policy would cease," the employee will receive an extension of time to elect coverage not exceeding 60 days. *See id.* at 22.

According to the record, Crabtree was "never provided any booklet, literature, or notice" about the "life-insurance benefit or any right to convert it ...." Dkt. 93-1 at 10 (Crabtree's declaration). And, because Crabtree failed to convert the life insurance policy within the 31-day election period, BlueCross denied his claim for benefits. *See* Dkt. 86-12 at 6-11 (November 14, 2024 notification); *see also* Dkt. 86-2 at 34.

As for health insurance, Crabtree was notified that his "group health insurance coverage w[ould] cease on the last day of" May 2024. Dkt. 86-11 at 5. The letter advised Crabtree that he "w[ould] receive via mail, information regarding" his COBRA election rights. *Id.* Crabtree elected COBRA coverage and exhausted his 18-month eligibility. Dkt. 86-2 at 31.

On January 30, 2025, WEX Health Inc.—the entity handling Certarus's COBRA communications—informed Crabtree that there was a $26.51 shortfall in his premium payment. Dkt. 86-11 at 16 (letter); *see also* Dkt. 86-2 at 33. The shortfall stemmed from a $29 increase in Crabtree's insurance premium, effective January 1, 2025. *See* Dkt. 86-2 at 31-32. Crabtree asserts that he was not notified about the increase. *See id.* at 32-33.

The letter noted that Crabtree had a grace period to pay the balance to continue his COBRA coverage. *See* Dkt. 86-11 at 16. Because Crabtree ultimately paid that balance, his benefits did not lapse. *See* Dkt. 86-2 at 31-32 (Crabtree "took full advantage of COBRA coverage").

## III. Procedural history

Crabtree filed a discrimination charge with the Equal Employment Opportunity Commission on August 2, 2024. Dkt. 86-13. He sued Certarus and its parent company, Superior Plus Corporation, on February 19, 2025. Dkt. 1. Crabtree later amended his complaint, asserting claims under (1) the Americans with Disabilities Act ("ADA"), (2) the Employment Retirement Income Security Act ("ERISA"), and (3) the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Dkt. 6. Certarus filed an answer to the amended complaint. Dkt. 11 (original answer). All claims against Superior Plus were later dismissed for lack of personal jurisdiction. *See* Dkt. 65 (adopting Dkt. 50).

On May 7, 2026, Crabtree filed a motion for sanctions, claiming that Certarus's answer (Dkt. 11) violated Rule 11 by denying certain factual allegations and raising certain affirmative defenses. Dkt. 80. The certificate of conference reflects that he served the motion more than 21 days before filing it. *See id.* at 51. Certarus responded to the motion, Dkt. 87, and Crabtree replied, Dkt. 89.

Certarus later moved for summary judgment on all claims, Dkt. 86, to which Crabtree responded, Dkt. 93, and Certarus replied, Dkt. 98. The foregoing motions are ripe for resolution.[3]

## Legal Standard

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if the issue it addresses "could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).

When resolving a motion for summary judgment, courts must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (quotation omitted). "[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party …." *Union*

[3] Crabtree's motion seeking trial accommodations is not addressed herein. Dkt. 92.

*Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001). In addition, courts must credit all reasonable inferences from the evidence, without "weigh[ing] evidence or mak[ing] credibility findings." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022). And the pleadings of *pro se* litigants are liberally construed. *See Jennings v. Towers Watson*, 11 F.4th 335, 341 (5th Cir. 2021) (employment case). But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (quoting *Brown v. City of Hou.*, 337 F.3d 539, 541 (5th Cir. 2003)). Further, *pro se* parties "must comply with the Federal Rules of Civil Procedure and present proper summary judgment evidence." *Rolen v. City of Brownsfield*, 182 F. App'x 362, 365 (5th Cir. 2006) (per curiam) (citing *Gordon v. Watson*, 622 F.3d 120, 123 (5th Cir. 1980)).

## Analysis

Certarus is entitled to summary judgment on Crabtree's ADA and ERISA health insurance claims. But Crabtree has raised a genuine dispute of material fact that bars summary judgment on his ERISA life insurance claim. He has not, however, shown that sanctions against Certarus are merited. Both Crabtree's motion for sanctions and Certarus's request for attorneys' fees incurred defending against that motion are denied.

## I. <u>Certarus is entitled to summary judgment on certain claims.</u>

### A. The ADA discrimination claim fails because Crabtree has not shown that Certarus's reasons for terminating him were pretextual.

For his ADA discrimination claim, Crabtree alleges that Certarus terminated him because of his disability. Dkt. 6 at 16. But Certarus maintains that it terminated Crabtree because of his unsafe driving, which caused damage to his company vehicle. *See* Dkt. 86 at 23-24. Because Crabtree has not shown that Certarus's proffered explanation was pretextual, his ADA discrimination claim is barred.

The ADA prohibits discrimination against qualified individuals based on disability. 42 U.S.C. § 12112(a); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Because there is no direct evidence of disability discrimination, Crabtree's claim is subject to the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Way v. City of Missouri City*, 133 F.4th 509, 517 (5th Cir. 2025). Under that framework, Crabtree must make a *prima facie* case of discrimination by showing "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *See LHC Grp., Inc.*, 773 F.3d at 697 (quotation omitted).

If that showing is made, the burden would shift to Certarus to "articulate a legitimate non-discriminatory reason for the adverse employment action."

*See Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016) (quoting *EEOC v. Chevron Phillips Chem. Co., L.P.*, 570 F.3d 606, 615 (5th Cir. 2009)). After that, Crabtree would need "to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.*

Even assuming that Crabtree met his *prima facie* burden, Certarus has proffered a non-discriminatory reason for terminating his employment. In particular, the personnel who made the decision cited Crabtree's unsafe driving incidents, which violated company policies. For example, Lucas—the general manager who oversaw Crabtree's supervisors—explained that he terminated Crabtree solely because of his "history of unsafe driving events, negligence in maintaining his Company truck, and excessive damage to his truck." Dkt. 86-2 at 43. Emails between Crabtree's supervisors and human resources personnel consistently indicate that Crabtree's driving incidents were the basis for termination. *See, e.g.*, Dkt. 86-10 at 10 ("Unfortunately on the driving side, [Crabtree] has damaged Certarus equipment numerous times and has shown negligence on the maintenance of his vehicle."); Dkt. 97 at 26-27 (summarizing driving events as "the reason for the request to terminate").

Indeed, it is undisputed that Crabtree caused numerous driving events. *See* Dkt. 86-5 at 21-24 (June 2, 2022 collision); Dkt. 86-5 at 4 (July 15, 2022 first fatigue incident); Dkt. 86-5 at 6 (October 17, 2022 second fatigue incident);

Dkt. 86-6 at 10 (March 16, 2023 ditch incident); Dkt. 86-5 at 8 (August 13, 2023 third fatigue incident); Dkt. 86-5 at 10 (April 15, 2024 pothole incident). Those incidents resulted in thousands of dollars of damage to Certarus's vehicle. *See* Dkt. 97 at 17-19. Crabtree also violated Certarus's vehicle use policy, which prohibits employees from operating a vehicle while fatigued. *See* Dkt. 86-4 at 10. Both poor job performance and company policy violations are legitimate reasons for termination. *See Ramirez v. PHI Health, LLC*, 762 F. Supp. 3d 596, 611 (S.D. Tex. 2025) (poor performance); *Bowen v. Univ. of Tex. Med. Branch*, 2022 WL 868707, at *7 (S.D. Tex. Feb. 14, 2022), *adopted by* 2022 WL 861506 (S.D. Tex. Mar. 23, 2022) (violating policy).

Because Certarus articulated legitimate, nondiscriminatory reasons for Crabtree's termination, the burden shifts to Crabtree to "present 'substantial evidence' that" those reasons were pretext for disability discrimination. *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016). "Pretext is established 'either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Id.* (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 89 (5th Cir. 2019) (per curiam).

Crabtree asserts that the "falsity" of Certarus's explanation supports pretext. *See* Dkt. 93 at 11. He relies on evidence apart from the driving incidents themselves to claim that he was a safe driver. For example, he emphasizes that he never received a formal written warning until August 2023. *See* Dkt. 93 at 8; Dkt. 97-7 at 21 (noting that the August 17, 2023 "final warning" was Crabtree's first written disciplinary action). For 13 of his 15 months of employment, he received driver safety ratings between 97 and 100. Dkt. 96-3 at 15. And he received a "safety leader" award. Dkt. 96-4 at 1-2.

None of that evidence engages the undisputed fact that Crabtree *did* commit numerous safety violations—including falling asleep behind the wheel. More fundamentally, the issue is not whether Certarus was justified in choosing to terminate Crabtree for those driving incidents. *See Ramirez v. PHI Hlth., LLC*, 762 F. Supp. 3d 596, 613 (S.D. Tex. 2025) ("Merely disputing [the employer's] assessment of [an employee's] performance will not create an issue of fact.") (quoting *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)). Rather, "[t]he issue at the pretext stage is whether [the employer's] reason, *even if incorrect*, was the real reason for [the employee's] termination." *Sandstad*, 309 F.3d at 899 (emphasis added); *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999). Nothing in the record suggests that Crabtree's disability—rather than the cited safety incidents—was the impetus behind Certarus's decision.

Nor has Crabtree shown pretext through evidence that he was "treated differently, and worse, than non-disabled employees." *See Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 484 (5th Cir. 2023). For discrimination claims, "an employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken under nearly identical circumstances." *Id.* (quotation omitted) (affirming summary judgment against an employee claiming disability discrimination where the employee's proffered comparators were "easily distinguishable form his own circumstances"). Crabtree has not come close to meeting that requirement. He merely mentions in passing that other "drivers who struck a vehicle, struck a pole, and ran a stop sign each kept their jobs on a Final Warning." Dkt. 93 at 11 (citing "Exhibit S"—notification that Crabtree did not receive technical training position). That assertion is unsupported and fails to show that those drivers were sufficiently comparable to Crabtree.

Crabtree also relies on the temporal proximity between his disability disclosures and his termination. *See, e.g.*, Dkt. 93 at 8-9, 12. But "[t]iming standing alone is not sufficient absent other evidence of pretext." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998); *see also, e.g.*, *Maldonado v. Harris Cnty.*, 2025 WL 2443389, at *5 (S.D. Tex. Aug. 25, 2025) (rejecting reliance on timing alone to show pretext in disability discrimination case, citing *inter alia Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 354 (5th

Cir. 2014)). Crabtree has submitted no "'other significant evidence of pretext'" that, "when combined with its 'suspicious timing,'" enables [him] to survive summary judgment." *See Maldonado*, 2025 WL 2443389 at *6 (quoting *Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001)). Because Crabtree has proffered no evidence that would permit a jury to infer that his disability was the real reason for his termination, this Court should grant summary judgment to Certarus on Crabtree's ADA discrimination claim.

**B. Crabtree fails to raise a fact issue on his ADA accommodation claim.**

Crabtree also asserts an ADA failure-to-accommodate claim, alleging that Certarus violated the ADA by failing to reassign him to a vacant office-based role. Dkt. 6 at 16-17. Certarus challenges that claim because Crabtree never requested that accommodation. Dkt. 86 at 25-28. And even if he did, Certarus argues that the ADA did not require it to give him the position over more qualified candidates. *Id.* at 27-28 (citing *EEOC v. Methodist Hosps. of Dall.*, 62 F.4th 938, 947 (5th Cir. 2023)). Certarus is correct on both fronts.

For a failure-to-accommodate claim, a plaintiff must prove that "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Weber v. BNSF Ry.*, 989 F.3d 320, 323 (5th Cir. 2021) (quotation

omitted). "An employee who needs an accommodation ... has the responsibility of informing [his] employer." *Delaval*, 824 F.3d at 481 (quoting *Chevron Phillips*, 570 F.3d at 621). "Special words, like 'reasonable accommodation,' need not be uttered, but the employee 'must explain that the [proposed] adjustment ... is for a medical condition-related reason ....'" *Id.* (quoting *Chevron Phillips*, 570 F.3d at 621). "If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one." *Taylor v. Principal Fin. Group*, 93 F.3d 155, 165 (5th Cir. 1996); *see also Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587-88 (5th Cir. 2020) (affirming rejection of ADA claim where plaintiff "did not request an accommodation").

Crabtree maintains that Certarus knew he was applying to other positions within the company as accommodations. *See* Dkt. 93 at 15-16. He largely relies on his March 7, 2024 interview for the technical training specialist position. *See id.* But Crabtree's references to his back condition when speaking with Chagnon do not constitute an accommodation request.

During the interview, Chagnon explained how, given his own age and desire to spend more time with his family, he had benefited from gaining more personal time working as a technical training specialist position. *See* Audio at 33:13-33:30, 34:48-35:03. Crabtree responded conversationally that he was diagnosed with degenerative disc disease in his early 20s, but he never made an explicit request for special accommodations. *Id.* at 35:04-35:17. Nor did he

suggest that he was seeking the technical training specialist position as a disability accommodation.

Crabtree also argues that he "told Human Resources in writing he 'could no longer continue in [his] current role.'" Dkt. 93 at 16 (citing Dkt. 97 at 7). The cited March 15, 2024 email, however, discusses the possibility that Crabtree "may have to go on long term disability," which he later did Dkt. 97 at 7; *see* Dkt. 86-2 at 12. The email does not mention reassignment, much less the possibility of moving Crabtree to a technical training specialist position.

Although Crabtree mentioned his disability to various Certarus employees, that is not enough. "After disclosing [his] disability," Crabtree "needed to explain that the" reassignment he was "seeking is for a medical condition-related reason." *See Way*, 133 F.4th at 519 (quotation omitted). Yet Crabtree concedes that he never "actually requested" an accommodation that Certarus denied. *See* Dkt. 86-2 at 12. Crabtree cannot fault Certarus for not addressing a request for accommodation that he never made.

In support of summary judgment, Certarus argues that, even if Crabtree had requested a reassignment as a disability accommodation, he would not have been automatically entitled to those requests. Dkt. 86 at 27-28 (citing *Methodist Hosps.*, 62 F.4th at 947). "[T]he ADA says that the term 'reasonable accommodation may include ... reassignment to a vacant position.'" *US Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (quoting § 12111(9)(B)). But

"reassignment is not a reasonable accommodation when an employer has an established seniority system." *Methodist Hosps.*, 62 F.4th at 943-44 (citing *Barnett*, 535 U.S. at 403). For instance, a reassignment that violates an employer's "most-qualified-applicable policy" would not be a reasonable accommodation. *See id.* at 945-47.

Certarus provided uncontroverted evidence that it chose more qualified applicants for the positions that Crabtree sought. *See* Dkt. 86-3 at 2 (Martinez "selected another candidate for the Technician Coordinator position who I felt was better qualified for the job"); Dkt. 86-7 at 16 ("Following candidate interviews, [Fontaine's] opinion was that Mr. Crabtree lacked the knowledge and skills [Certarus] needed, and [he] decided to proceed with other candidates who [he] felt were better qualified for the position."). Further, Crabtree later told Eugene that he did not receive the technical training specialist position because he "completely bombed" his second-round interview. *See* Dkt. 97-8 at 15 ("I was that bad at the interview … I mean the guy must have thought I was a complete total moron."). Crabtree submitted no evidence indicating that it would have been reasonable to give him the position regardless. He merely asserts—"on information and belief"—that Holcomb was moved to an office-based role "in connection with his physical limitations …." Dkt. 93-1 at 11-12. Crabtree's subjective belief is not evidence. And it fails to show that Crabtree would likewise be entitled to reassignment as a reasonable accommodation,

even if he had requested one. Summary judgment should be granted for Certarus on both ADA claims.

### C. Genuine disputes of material fact bar summary judgment on the ERISA life insurance claim.

Regarding his life insurance benefits, Crabtree claims that Certarus breached its fiduciary duties under ERISA by failing to accurately inform him of his right to convert his life insurance policy. *See* Dkt. 6 at 17-19; *see also* Dkt. 93 at 18 (clarifying claim). Crabtree asserts that claim under ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3).[4] *See* Dkt. 93 at 19-20.

Certarus argues the breach of fiduciary duty claim fails because Section 502(a)(1)(B) provides another remedy for wrongful denial of benefits. Dkt. 86 at 28-29. That position conflicts with settled law. Certarus's alternative position that the Employee Benefit Booklet satisfies its notice obligations is not conclusive either. Record evidence reflects that Crabtree was not given a copy of that booklet. Fact questions thus preclude summary judgment on the Section 502(a)(3) claim.

---

[4] Crabtree has abandoned reliance on ERISA's continuation-of-coverage provisions and an interference-with-ERISA rights theory. *See* Dkt. 93 at 18 ("Plaintiff does not rest his life-insurance claim on COBRA's continuation-coverage notice provisions, 29 U.S.C. §§ 1161-1168, which by their terms govern group health plans …."), 20 ("To the extent Defendant reads Count III to assert a separate § 1140 interference theory … Plaintiff's life insurance claim rests on Defendant's fiduciary breach and affirmative misrepresentation of his conversion rights under § 502(a)(3).").

1. General framework for ERISA breach-of-fiduciary-duty claims

ERISA sets out several fiduciary duties owed to plan participants and beneficiaries. 29 U.S.C. § 1104(a)(1). Section 502 is ERISA's civil enforcement provision. 29 U.S.C. § 1132. Subsection 502(a)(1) provides that a plan participant or beneficiary may bring a "civil action … to recover benefits due to him under the terms of his plan" or otherwise enforce or clarify his rights under the plan. 29 U.S.C. § 1132(a)(1).

Subsections 502(a)(2) and (a)(3) "are the ERISA causes of action for breach of fiduciary duty." *Callery v. Exxonmobil Corp.*, 2021 WL 3711180, at *7 (S.D. Tex. Aug. 20, 2021) (citing *Hughes v. Legion Ins. Co.*, 2007 WL 781951, at *4 (S.D. Tex. Mar. 12, 2007)). Subsection 502(a)(2) provides relief under limited circumstances and must be brought against the plan itself. *See Brown v. Aetna Life Ins. Co.*, 975 F. Supp. 2d 610, 622 (W.D. Tex. 2013) (citing 29 U.S.C. § 1132(a)(2)).

Subsection 502(a)(3) authorizes a plan participant to bring a civil action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," and "to obtain other appropriate equitable relief ... to redress such violations" or "to enforce ... the terms of the plan." 29 U.S.C. § 1132(a)(3). The reference to "equitable relief" refers to "those categories of relief that were typically available in equity." *Great-West Life & Annuity Ins.*

*Co. v. Knudson*, 534 U.S. 204, 209-10 (2002). It includes injunctions, mandamus, restitution, surcharge, reformation, and equitable estoppel. *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 257 (1993); *CIGNA Corp v. Amara*, 563 U.S. 421, 440-42 (2011). Subsection 502(a)(3) is a "catchall" provision "to act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 490, 511 (1996); *see also Lopez v. Liberty Life Assur. Co. of Bos.*, 2013 WL 5774878, at *3 (S.D. Tex. Oct. 24, 2013).

2. <u>Crabtree's claim is cognizable under Section 502(a)(3).</u>

Certarus argues that Crabtree's breach of fiduciary duty claim under Section 502(a)(3) is barred because Section 502(a)(1)(B) provides a remedy for wrongful denials of benefits. Dkt. 86 at 28-29. As a starting point, "the Supreme Court determined that an ERISA plaintiff may bring a claim for breach of fiduciary duty under [Section 502](a)(3) when no other remedy is available." *Innova Hosp. S.A., Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 733 (5th Cir. 2018) (citing *Varity Corp.*, 516 U.S. at 510-15). Accordingly, "a claimant whose injury creates a cause of action under [Section 502](a)(1)(B) may not proceed with a claim under [Section 502](a)(3)." *Id.* (citation omitted).

Nevertheless, "claims for injuries relating to SPD deficiencies are cognizable under ERISA § 502(a)(3) and not ERISA § 502(a)(1)(B)." *Manuel v.*

*Turner Indus. Grp., L.L.C.*, 905 F.3d 859, 865-66 (5th Cir. 2018); *see also Krishna v. Life Ins. Co. of N. Am.*, 2023 WL 4676822, at *8 (5th Cir. July 21, 2023) (per curiam). In *Manuel*, a plaintiff sued his former employer after his benefits were denied. *See* 905 F.3d at 863. The plaintiff argued that the employer breached its fiduciary duties by not providing him with an SPD within 90 days after he became a plan participant and by maintaining a deficient SPD. *See id.* at 865. The Fifth Circuit found that his claims were "cognizable *only* under ERISA § 502(a)(3)." *Id.* at 866.

The *Manuel* decision relied on *CIGNA*, 563 U.S. at 443-44, where "the Supreme Court found that an employee injured by a deficient SPD could seek equitable relief under ERISA § 502(a)(3)." *Id.* at 866. The *Manuel* decision also drew support from *Singletary v. United Parcel Serv., Inc.*, 828 F.3d 342 (5th Cir. 2016). There, the plaintiff, who complained that "she had no notice" of a plan exclusion that the SPD failed to disclose, could not recover under Section 502(a)(1)(B) "as the insurer was simply enforcing the terms of the plan itself." *Manuel*, 905 F.3d at 866 (discussing *Singletary*). But as *Singletary* observed, the plaintiff "might have obtained relief under ERISA § 502(a)(3)." *Manuel*, 905 F.3d at 866 (citing *Singletary*, 828 F.3d at 348-49).

Under *Manuel*'s and *Singletary*'s rationale, Crabtree's claim that Certarus failed to provide him with the SPD is actionable under Section 502(a)(3), and not under Section 501(a)(1)(B). As explained in *Manuel*, Section

501(a)(1)(B) claims "are generally limited to actions 'respect[ing] ... the interpretation of plan documents and the payment of claims.'" 905 F.3d at 864 (quotation omitted). That provision allows a participant or beneficiary to bring suit when he "believes that benefits promised to him under the terms of the plan are not provided," in violation of that plan. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (citing 29 U.S.C. § 1132(a)(1)(B)). Yet here, Crabtree does not dispute that his claim was properly denied—under the terms of the plan—because he did not convert the policy by the specified deadline. *See* Dkt. 86-12 at 6-11. Rather, Crabtree contends that Certarus failed to provide him a copy of the SPD disclosing his conversion rights. His contention implicates ERISA's "numerous requirements beyond the mere payment of benefits in accord with a plan's written terms." *Manuel*, 905 F.3d at 864. It is therefore properly classified as a breach-of-fiduciary claim under Section 502(a)(3). *See, e.g.*, *Huerta v. Metro. Life Ins. Co.*, 2020 WL 974943, at *6 (S.D. Tex. Jan. 22, 2020) (reviewing failure to notify of option to convert life insurance claim under Section 502(a)(3)), *adopted by* 2020 WL 973388 (S.D. Tex. Feb. 28, 2020); *see also, e.g.*, *Fracalossi v. MoneyGram Pension Plan*, 2021 WL 5505604, at *8-9 (N.D. Tex. Nov. 24, 2021) (treating administrator's alleged failure to disclose plan modification as a claim under Section 502(a)(3), noting in part that plaintiff was "not eligible for benefits under the terms of the Plan" and thus did not have a Section 502(a)(1)(B) claim).

Further, Crabtree claims that Certarus made misrepresentations regarding his conversion rights. *See* Dkt. 93 at 19-20. "Misrepresentations and misinformation by a fiduciary may give rise to a breach of fiduciary duty claim under ERISA." *Barnette v. Sun Life Assur. Co. of Can.*, 2016 WL 1384688, at *4 (S.D. Tex. Apr. 7, 2016) (citing *Varity Corp.*, 516 U.S. at 493, 515; *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 n.1 (5th Cir. 2013)); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 424 (5th Cir. 2003) ("[A]n employer, if it chooses to communicate about the future of a participant's plan benefits, has a fiduciary duty to refrain from misrepresentations."). This claim is properly asserted as a breach-of-fiduciary duty under Section 502(a)(3).

3. <u>Crabtree has raised a genuine dispute of fact as to his breach of fiduciary duty claim.</u>

Certarus also contends that Crabtree presented no evidence that it breached its fiduciary duty. *See* Dkt. 86 at 29-30; *see also* Dkt. 98 at 12. According to Certarus, it satisfied its notice obligation because the Employee Benefit Booklet discloses that employees have a right to convert their life insurance policy. *See id.* at 29; Dkt. 86-11 at 18-22 (booklet). But Crabtree's declaration raises genuine disputes regarding whether Certarus provided that booklet and whether its benefits specialist incorrectly indicated that Crabtree could not convert the policy.

To recover under Section 1132(a)(3) "a plaintiff 'must establish that the defendant is (a) a plan fiduciary, (b) has breached its fiduciary duties under ERISA, (c) that such a breach caused the plaintiff's injury, and (d) that the equitable relief sought is indeed appropriate.'" *Keith v. Metro. Life Ins. Co.*, 2017 WL 1026008, at *3 (S.D. Tex. Mar. 15, 2017) (quoting *Shonowo v. Transocean Offshore Deepwater, Inc.*, 2011 WL 3418405, at *5 (S.D. Tex. Aug. 3, 2011)). Certarus does not dispute that it is a plan fiduciary or that it had a duty to provide Crabtree with an SPD. Indeed, "ERISA §§ 102(a) and 104(b), [] require a plan administrator to provide beneficiaries with summary plan descriptions …." *CIGNA*, 563 U.S. at 432 (citing 29 U.S.C. §§ 1022(a), 1024(b)). Certarus only challenges Crabtree's claim as to breach. *See* Dkt. 86 at 8, 29.

In a declaration, Crabtree states that he "was never provided any booklet, literature, or notice about [his] life-insurance benefit or any right to convert it …." *See* Dkt. 93-1 at 10. He also states that "Certarus's own Benefits Specialist completed waiver-of-premium forms that twice check 'Conversion Offered? NO' as to [his] life insurance …." *Id.*

The assertions in Crabtree's declaration—which Certarus neither addresses nor challenges—constitute competent summary judgment evidence. *See id.* at 13 (declaration made under penalty of perjury); 28 U.S.C. § 1746 (unsworn declarations); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) (unsworn declaration under Section 1746 can raise a fact issue).

Those assertions raise a genuine dispute of fact as to whether Certarus provided Crabtree with the employer benefits booklet and misinformed him that the life insurance policy could not be converted.[5] As a result, summary judgment should be denied on his Section 502(a)(3) claim.

### D. Crabtree's health insurance claim fails.

#### 1. Section 606 does not require Certarus to notify him of COBRA premium increases.

As another ERISA claim, Crabtree asserts that Certarus violated ERISA Section 606, 29 U.S.C. § 1166, by failing to notify the COBRA administrator (WEX) of his premium increase. *See* Dkt. 6 at 20; Dkt. 93 at 21-23. He argues that Certarus's omission led to a shortfall in his premium payment and endangered his COBRA benefits. *See* Dkt. 93 at 21. Certarus responds that a premium increase is not a qualifying life event that triggers Section 606's notice requirements. *See* Dkt. 86 at 30-31. On this record, Certarus is correct.

Section 606 requires employers to notify plan administrators of certain qualifying events. *See* 29 U.S.C. § 1166(a)(2). "A COBRA violation occurs

---

[5] Crabtree's assertion that Certarus made a misrepresentation in his May 24, 2024 termination call, however, is unsupported. He contends a Certarus representative incorrectly told him that he could not "transfer [] over" his life insurance benefits in that call. *See* Dkt. 93 at 18. He mischaracterizes the representative's statement, which addressed Crabtree's *disability* benefits—not the life insurance policy. Dkt. 97-1 at 6. Crabtree admitted to this mischaracterization in his deposition. *See* Dkt. 86-2 at 31 ("I remember asking if I could convert my—my ·disability policies over to, like, personal policies and they said—she said that you don't—doesn't think so because they're employer policies, she doesn't—that she didn't think I could convert employer policies, and that's what I remember.").

when there is a qualifying event and no notice ...." *Randolph v. E. Baton Rouge Par. Sch. Sys.*, 19 F.4th 749, 755 (5th Cir. 2021). ERISA does not list premium increases as an example of a qualifying event. *See* 29 U.S.C. § 1163 (qualifying events include: death, termination or reduction of hours, divorce, entitlement to social security benefits, a child becoming no longer dependent, a Title 11 proceeding). Nor is there any indication that the premium increased *because of* Crabtree's termination, such that it would constitute a qualifying event under the relevant regulation. *See* 26 C.F.R. § 54.4980B-4(c).

In response, Crabtree insists that Certarus misconstrues his theory for relief. *See* Dkt. 93 at 21-22. But instead of proffering a different theory, Crabtree doubles-down on the notion that Certarus violated Section 1166 by "fail[ing] to timely notify" WEX that the premium had increased. *See id.* Certarus had no notification duty under Section 606.

Crabtree also invokes ERISA Section 502(c), 29 U.S.C. § 1132(c), as a basis for his claim. Dkt. 93 at 21-23. That provision merely authorizes courts to impose penalties for COBRA notice violations. *See Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 879 (S.D. Tex. 2008) (citing *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1132 (5th Cir. 1996)). Without an underlying violation, however, Section 502(c) provides no relief.

2. No evidence suggests that Certarus intentionally interfered with Crabtree's benefits.

Crabtree also alleges that Certarus intentionally interfered with his ERISA benefits by providing delayed notice of the premium increase and falsely telling him that he paid the premium in full. *See* Dkt. 6 at 19, 23; *see also* Dkt. 93 at 22 (citing 29 U.S.C. § 1140). He alleges that Certarus's notification failures were retaliatory. *See* Dkt. 6 at 20.

Section 510 prohibits "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan …." 29 U.S.C. § 1140. "ERISA claims are examined under the *McDonnell Douglas* burden-shifting framework." *Jurach v. Safety Vision, LLC*, 72 F. Supp. 3d 698, 715 (S.D. Tex. 2014), *aff'd*, 642 F. App'x 313 (5th Cir. 2016). "To make a *prima facie* showing of interference under § 510, an employee must show '(1) prohibited (adverse) employer action, (2) taken for the purpose of interfering with the attainment of (3) any right to which the employee is entitled' or may become entitled." *Id.* (quoting *Bodine v. Emps. Cas. Co.*, 352 F.3d 245, 250 & n.3 (5th Cir. 2003)). Crabtree must also provide proof of Certarus's "specific discriminatory intent." *Id.*

Certarus contends that Crabtree submitted no evidence that it prevented him from obtaining benefits or did so with discriminatory intent. Dkt. 86 at

31; *see also* Dkt. 98 at 13. Indeed, Crabtree's contentions that Certarus's notification delays were intentional or retaliatory are wholly speculative, premised on the timing of his termination in relation to Certarus's calculation of his *disability benefits*. *See* Dkt. 93 at 22 (citing 93-1 at 10). That has no demonstrated link to his health insurance benefits. And bare reliance on temporal proximity is insufficient to overcome summary judgment anyway. *See Francis v. S. Cent. Hou. Action Council Inc.*, 2016 WL 1650790, at *10-11 (S.D. Tex. Apr. 25, 2016) (temporal proximity alone failed to raise a fact issue on pretext for an ERISA Section 510 claim), *aff'd*, 688 F. App'x 310 (5th Cir. 2017) (per curiam). Crabtree's ERISA interference claim fails.

## II. Crabtree's motion for sanctions is denied, as is Certarus's request for attorneys' fees.

Crabtree also filed a Rule 11 motion for sanctions against Certarus and its counsel Dkt. 80. He asserts that Certarus's answer (Dkt. 11) contains certain denials and two affirmative defenses that are controverted by evidence later revealed through discovery. *See id.* (citing Fed. R. Civ. P. 11(b)(2), (3), and (4)). Crabtee's motion misunderstands Rule 11's requirements. The deficiencies in his motion, however, do not merit a fee award for Certarus.

### A. Rule 11 standard

Rule 11 governs sanctions for false or inaccurate representations in court filings. *See* Fed. R. Civ. P. 11(b); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S.

384, 393 (1990) (explaining Rule 11's purpose "to deter baseless filings in district court"). Courts can impose Rule 11 sanctions on an attorney or a party responsible for the violation, provided each was provided notice and a reasonable opportunity to respond. Fed. R. Civ. P. 11(c)(1); *see also Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 567 (5th Cir. 2006) (Rule 11 authorizes sanctions against "against a client as well as his attorney"). Whether Rule 11 sanctions are merited lies within the court's sound discretion. *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 802 (5th Cir. 2003).

By presenting a filing, an attorney certifies, among other things, that defenses "are warranted by existing law or by a nonfrivolous argument …." Fed. R. Civ. P. 11(b)(2). An attorney also certifies that the factual assertions contained therein "have evidentiary support" or would likely be supported "after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). And "denials of factual contentions" must be "warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(b)(4). Those certifications are based on the attorneys' "knowledge, information, and belief" after a reasonable inquiry. Fed. R. Civ. P. 11(b). "Reasonableness is reviewed according to the 'snapshot' rule, focusing upon the instant the attorney affixes his signature to the document." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 528 (5th

Cir. 2016) (quoting *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992)).

### B. Crabtree's disagreement with Certarus's denials in its answer does not justify sanctions.

Crabtree also claims that Certarus's answer contains false information because the evidence contradicts certain denials. Dkt. 80 at 10-26. He challenges nearly every denial in the answer. *See id.* But most of those denials responded to allegations that were loaded with subjective characterizations, legal arguments, and information not within Certarus's knowledge. *See, e.g.*, Dkt. 6 at 4 ("Plaintiff … consistently met or exceeded performance expectations."), 5 (the technician trainer position "was a perfect reasonable accommodation under the ADA"), 7 ("Plaintiff had no choice but to continue this medication regimen because Defendants refused to provide reasonable accommodations."). Denials of those allegations are permitted. *See* Advisory Committee Notes to Rule 11 (1993 Amendments) (denials are permissible where a party has evidence contradicting the fact, "has no information concerning the matter," or believes the allegation not to be true).

Moreover, "[t]he signing attorney has a duty of reasonable inquiry, but his signature is not a guarantee of the correctness of the legal theories argued, nor is it a guarantee of all alleged facts, especially if the matter is not easily discovered by extrinsic evidence." *Health Net, Inc. v. Wooley*, 534 F.3d 487, 497

(5th Cir. 2008) (citations omitted). The Fifth Circuit has developed factors "to determine whether an attorney has made a reasonable inquiry into the facts sufficient to satisfy Rule 11: [(1)] the time available to the signer for investigation; [(2)] the extent of the attorney's reliance upon his client for the factual support for the document; [(3)] the feasibility of pre-filing investigation; [(4)] whether the signing attorney accepted the case from another member of the bar or forwarding attorney; [(5)] the complexity of the factual and legal issues; and [(6)] the extent to which development of the factual circumstances underlying the claim requires discovery." *Childs v. State Farm Mut. Auto. Ins. Co.*, 29 F.3d 1018, 1026 (5th Cir. 1994) (citing *Thomas v. Cap. Sec. Servs., Inc.*, 836 F.2d 866, 875 (5th Cir. 1988); *St. Amant v. Bernard*, 859 F.2d 379, 383 (5th Cir. 1988)).

Crabtree argues that certain factual denials violated Rule 11 because they were contradicted by records in Certarus's possession. Dkt. 80 at 10-26. Even if that were true, Crabtree has not shown it would have been reasonable, either for Certarus or its counsel, to have gathered and reviewed the full record within the 21-day deadline to file an answer. And Certarus attaches declarations from counsel regarding the diligence of their inquiry into the facts and law before drafting the answer. *See* Dkt. 87-1 (Heather Vickles's declaration); Dkt. 87-2 (Kevin Pennell's declaration).

Ultimately, a motion for sanctions is not the avenue to debate each factual issue in this case. The Fifth Circuit "does not allow the imposition of rule 11 sanctions merely for the eventual failure of factual and legal arguments after a trial; sanctions are to be applied only where, at the time of the filing, such arguments were unwarranted." *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1300 (5th Cir. 1994). Accordingly, "a Rule 11 motion that makes only essentially summary judgment arguments about the legal and factual sufficiency of the [pleading]' is 'not a proper invocation of the Court's discretion to impose the extraordinary remedy of sanctions …." *Castro & Co., LLC v. Diamond Offshore Servs. Ltd.*, 2018 WL 6069973, at *13 (N.D. Tex. Oct. 29, 2018) (quotation omitted), *adopted by* 2018 WL 6068977 (N.D. Tex. Nov. 20, 2018).

Crabtree's motion for sanctions impermissibly seeks to turn Rule 11 into a mechanism for obtaining summary judgment. This is doubly evident from Crabtree's factual assertions that he ultimately failed to substantiate. *Compare, e.g.*, Dkt. 6 at 5 (describing the "Coordinator position" as an "egregious example[ ]" of Certarus's "failure to accommodate"), at 9 (claiming that Certarus "continued to deny accommodations" despite knowing about his need for medical treatment), *with supra* Part I.B (rejecting ADA failure-to-accommodate claim). In fact, other than the single ERISA claim above, he has not raised a triable issue of fact. There is no adequate basis for sanctions. *See Scott v. Wollney*, 2021 WL 4851848, at *5-6 (N.D. Tex. Sept. 16, 2021) (denying

Rule 11 motion based on defendant's "false denials" in its answer because the "motion is largely based on disputed evidence, and it essentially reasserts [plaintiff's] summary judgment arguments").

Crabtree also claims Certarus should be sanctioned for asserting certain affirmative defenses. *See* Dkt. 80 at 26-27. He disputes Certarus's fifth affirmative defense: "Plaintiff's claims are barred or limited based on his failure to request accommodation of any alleged disability and failure to engage in the interactive process." Dkt. 11 at 11. And Crabtree challenges Certarus's ninth affirmative defense: "Plaintiff's damages, if any, are barred or limited based on Defendant's good faith efforts to identify and make reasonable accommodations once Plaintiff communicated a need for accommodation." Dkt. 11 at 12. But Crabtree merely repackages summary judgment theories that should be rejected, *see supra* Part I.B. *See* Dkt. 80 at 26-27.

Even if Certarus's affirmative defense arguments ultimately failed, that would not be a basis for sanctions. "A trial court should not impose Rule 11 sanctions for advocacy of a plausible legal theory …." *Snow Ingredients*, 833 F.3d at 528 (quoting *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 989 F.2d 791, 793 (5th Cir. 1993)); *see also Cmty. Loan Servicing, LLC v. Gonzalez*, 2021 WL 12301182, at *5 (S.D. Tex. Aug. 16, 2021) ("Rule 11 is not meant to weed out [a litigant's] weak legal and factual arguments …." (quotation omitted)). Crabtree's motion for sanctions is denied.

### C. Certarus's fee request is denied.

Certarus requests attorneys' fees related to defending against the motion for sanctions. *See* Dkt. 87 at 23-27 (citing Fed. R. Civ. P. 11(c)(2)). "If warranted," Rule 11 provides that the Court "may award" fees "to the prevailing party" of a motion for sanctions. Fed. R. Civ. P. 11(c)(2). That party may include "the target of the [Rule 11] motion." *See* Advisory Committee Notes to Rule 11(b)-(c) (1993 amendment). But the rule "does not mandate the award of expenses to all parties that prevail on motions for sanctions." *Adhikari v. Daoud & Partners*, 2017 WL 5904782, at *8 (S.D. Tex. Nov. 30, 2017); *see also Dunster Live, LLC v. LoneStar Logos Mgmt. Co., LLC*, 2017 WL 11219769, at *2 (W.D. Tex. Aug. 8, 2017) ("[T]he plain text of the statute makes clear [that] an award of attorney's fees under this provision is at the court's discretion."), *adopted by* 2017 WL 11219770 (W.D. Tex. Aug. 30, 2017), *aff'd*, 908 F.3d 948 (5th Cir. 2018).

Certarus argues that Crabtree's Rule 11 motion "is the latest in a series of meritless filings that have required Certarus to incur substantial unnecessary attorneys' fees and have required the Court to expend scarce judicial resources." Dkt. 87 at 24 (citing Dkts. 8, 10, 14, 19, 35, 38, 43, 57, 59). But Rule 11(c)(2)'s prevailing party award is different than a cross-motion for sanctions. *See Adhikari*, 2017 WL 5904782, at *3 (citing advisory committee's note). Rule 11(c)(2) permits a court to award fees incurred defending against

a motion for sanctions when Rule 11 has been misused. *See id.* at *8-9 (collecting cases). It does not provide a vehicle to complain about Crabtree's conduct *other than* the Rule 11 motion itself.

While Crabtree's arguments in its motion for sanctions are meritless, Certarus has not shown that the motion was such a misuse of Rule 11 as to warrant shifting fees. The Court therefore denies Certarus's request for attorneys' fees.

## Recommendation and Conclusion

For the foregoing reasons, it is **RECOMMENDED** that Defendant Certarus (USA) Ltd.'s motion for summary judgment (Dkt. 86) be **GRANTED IN PART** and **DENIED IN PART** as follows. Plaintiff John Crabtree's ADA claims and ERISA health insurance claim should be **DISMISSED WITH PREJUDICE**. But Certarus' motion for summary judgment is **DENIED** as to Crabtree's ERISA life insurance claim.

It is **ORDERED** that Crabtree's motion for sanctions (Dkt. 80) be **DENIED**. It is further **ORDERED** that Certarus's motion (Dkt. 87 at 23-27) for fees incurred defending against that motion also be **DENIED**.

**The parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for**

**plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).**

Signed on August 6, 2026, at Houston, Texas.

Yvonne Y. Ho
United States Magistrate Judge